# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | |
|---|---|
| **LP SOLUTIONS, LLC,** | ) |
| | ) |
| **PLAINTIFF** | ) |
| | ) |
| **V.** | ) |
| | ) |
| **CRAIG J. DUCHOSSOIS,** | ) |
| ***Individually and as Co-Executor of*** | ) |
| ***the Estate of Richard Bruce*** | ) CIVIL No. 2:18-CV-25-DBH |
| ***Duchossois***; **RICHARD J.** | ) |
| **DUCHOSSOIS; KIMBERLY T.** | ) |
| **DUCHOSSOIS; DAYLE P.** | ) |
| **DUCHOSSOIS-FORTINO;** AND | ) |
| **THOMAS A. SMITH,** ***Co-Executor of*** | ) |
| ***the Estate of Richard Bruce*** | ) |
| ***Duchossois,*** | ) |
| | ) |
| **DEFENDANTS** | ) |

## ORDER ON MOTION TO DISMISS FOR LACK OF JURISDICTION

The issue here is whether a federal court in Maine, with diversity
jurisdiction, has specific personal jurisdiction over a family of mostly Illinois
residents. Five members of that family—Richard L. Duchossois and his children
Craig J. Duchossois, Kimberly T. Duchossois, Dayle P. Duchossois-Fortino, and
Richard Bruce Duchossois[1]—signed contracts giving a Maine company the
option to acquire their interests in an Illinois limited partnership involving
Illinois real estate and the right to a portion of the cash distributions from the

---

[1] Collectively, the Duchossoises, the Family, or the defendants. Richard Bruce Duchossois died
in 2014, before this lawsuit arose. His estate has participated in the lawsuit, and all relevant
underlying matters, through its co-executors, Craig J. Duchossois and Thomas A. Smith, named
as defendants here in that capacity. Craig J. Duchossois is also an individual defendant.

partnership in the meantime. The Maine company, LP Solutions, LLC (LPS), exercised its options in due course. When the Duchossoises stopped making payments allegedly due under the agreements, LPS sued them in Maine state court for breach of contract and unjust enrichment. Compl. ¶¶ 63-83 (ECF No. 5-2). The Duchossoises removed the case to federal court and moved to dismiss for lack of personal jurisdiction or, in the alternative, for a stay pending the results of a related lawsuit in Illinois state court between LPS and the Illinois partnership's General Partner. Notice of Removal (ECF No. 1); Defs.' Mot. 1-2 (ECF No. 6). After briefing and argument, I now **GRANT** the defendants' motion and **DISMISS** the complaint, concluding on a prima facie record that the defendants have not purposefully availed themselves of Maine and thus that there is no specific personal jurisdiction over them here.

## FACTS

Under the First Circuit's "prima facie review" standard for determining personal jurisdiction, I accept the specific facts that the plaintiff alleges so far as record evidence supports them. I also accept the facts that the defendants offer to the extent they are uncontradicted. Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 31 (1st Cir. 2010). I construe the plaintiff's "properly documented evidentiary proffers . . . in the light most favorable to [its] jurisdictional claim." A Corp. v. All American Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016).

Four of the five defendants are domiciled in Illinois, and their agents[2] acted on their behalf from Illinois. Before he died in July of 2014, Richard Bruce Duchossois split his time between South Carolina and Florida, where his estate is now in probate. The defendants have no connections to Maine apart from this lawsuit and the events underlying it. Defs.' Mot. 2-3.

### Contract Formation

In September of 2013, the defendants received form letters from the plaintiff soliciting the purchase of their interests in Elm Street Plaza Venture, an Illinois limited partnership (the Partnership). An agent of the plaintiff, William Gendron, followed up by phone with an agent of the defendants, Jennifer Hager, about the offer. Hager rejected the offer based on tax considerations. Gendron then told Hager about LPS's "Option Program," which he said would have attractive tax consequences for the defendants. Hager asked to see the agreements embodying the Option Program. A few days later Gendron emailed a draft of the Option Agreement to another Duchossois agent, Janet Czosek, along with a letter outlining the proposal. That proposal said the Option Program would allow the defendants to "lock [in]" the value of their partnership interests "at today's market value, receive a significant portion of the purchase price on a tax-deferred basis and avoid tax recapture." Affordable Option Program, Hager Decl. Ex. D (ECF No. 6-8). Czosek forwarded these materials to Hager. Fully

---

[2] The defendants' financial affairs are managed largely by their agents, who are employees of various entities controlled by the Family in addition to being agents of the defendants individually. The children's primary agent in dealing with LPS was Jennifer Hager; the father's was Janet Czosek. Hager and Czosek communicated regularly and coordinated their work on behalf of the Duchossoises. Czosek Decl. ¶¶ 1-5 (ECF No. 6-1); Hager Decl. ¶¶ 1-5 (ECF No. 6-4).

drafted versions of the Option Agreement arrived in Illinois by FedEx shortly thereafter, already signed by a representative of the plaintiff. Hager and Czosek emailed LPS that the terms of the Option Agreement were acceptable, collected signatures from the Duchossoises in Illinois and South Carolina, and, in early October, FedExed the executed agreements to the plaintiff in Maine. An LPS employee then emailed Hager and Czosek that the signed agreements lacked witness signatures. Hager and Czosek obtained new signature pages from the Duchossoises (presumably with witness signatures) and sent them to the plaintiff.[3]  Defs.' Mot. 4-6; Czosek Decl. ¶¶ 10-21 (ECF No. 6-1); Hager Decl. ¶¶ 20-27 (ECF No. 6-4); Pl.'s Opp'n 3, 7 (ECF No. 7); Gendron Decl. ¶¶ 4-8 (ECF No. 7-13).

***Contract Terms***

The Option Agreements gave the plaintiff a twenty-year option to purchase each of the defendants' interests in the Partnership for a specified amount[4] (the plaintiff would also take on certain related tax liability incurred by a defendant for selling the interest during his or her lifetime).  Option Agreement ¶ 2, Booth Decl. Ex. 2 (ECF No. 7-3).[5]  The plaintiff agreed to pay 50% of the option price upon execution of the Option Agreement, followed by two additional installment payments of about 10% of the option price, to be paid annually, with the balance due upon exercise of the option.  Id. ¶¶ 3, 5.  In turn, prior to exercise, the

---

[3] The parties dispute whether these events amount to "negotiations," but do not meaningfully dispute the underlying facts, and nothing turns on the label.

[4] In total, $71,023 each for the children and $284,091 for the father.

[5] The signed Option Agreements and Assignments are all contained in this exhibit.  The terms of the agreements are identical, save for dollar amounts and the identity and location of the particular defendant.  I therefore cite them all generally as "Option Agreement" or "Assignment."

defendants agreed to pay the plaintiff a portion of cash flow distributions from the Partnership equal to the proportion LPS had paid of the option price (*e.g.*, if LPS had paid 50% of the option price, it would be entitled to 50% of normal distributions from the partnership). Id. ¶ 6.  The defendants also agreed not to alienate or encumber their partnership interests and to vote their interests as directed by the plaintiff.  Id. ¶ 4.  The Agreements specify that communications to the plaintiff were to be sent to its address in Maine.  Id. ¶ 9.  They also contain a Maine choice-of-law provision.  Id. ¶ 10.

The defendants agreed that, upon the plaintiff's exercise of the options, they would transfer their partnership interests to the plaintiff for nominal consideration by executing the Assignment of Partnership Interest, attached to the Option Agreements as an exhibit.  Id. ¶ 5.  The Assignments purport to transfer completely the defendants' partnership interests to the plaintiff. Assignment of Partnership Interest ¶ 1, Ex. A. to Option Agreement, Booth Decl. Ex. 2 (ECF No. 7-3).  Unlike the Option Agreements, the Assignments are governed by "the laws of the state where the Partnership is domiciled," which is Illinois.  Id. ¶ 5.

**Performance, Exercise of Options, and Breach**

Once the Option Agreements were signed, LPS made the initial installment payments to the defendants in Illinois in October of 2013 by mailing checks to the children and wiring money to the father.  Booth Decl. ¶ 10 (ECF No. 7-1); Booth Decl. Ex. 3 (ECF No. 7-4).

In June 2014, the defendants paid the plaintiff a portion of cash distributions from the Partnership, as required by paragraph six of the Option

Agreements. It did so by sending checks into Maine. Booth Decl. ¶ 25; Booth Decl. Ex. 8 (ECF No. 7-9).

After Richard Bruce Duchossois died in July 2014, an agent notified the plaintiff by email.[6] The plaintiff then exercised its option on his interest and, in late August, sent the balance of the option price to Richard Bruce Duchossois's estate by check. The estate executed the Assignment and sent it to the plaintiff in Maine in early August. Booth Decl. ¶¶ 10, 17; Booth Decl. Ex. 4 (ECF No. 7-5); Defs.' Mot. 7; Hager Decl. ¶ 31.

In October of 2014, LPS made the second round of installment payments to the other four defendants (again by mailing checks to the children and wiring money to the father). Booth Decl. ¶ 10; Booth Decl. Ex. 3.[7]

On November 12, 2014, Hager on behalf of the Duchossoises emailed Gendron that "[w]e are anxious to speak to you about the tax consequences" of the Option Agreements. Booth Decl. Ex. 5 (ECF No. 7-6). Gendron understood this to mean that the defendants wanted the plaintiff to exercise its remaining options on the Family's interests. Gendron Decl. ¶ 14. Hager and Gendron spoke by phone on the 18th about this wish, and the parties corresponded back and forth into January about getting the Assignments signed. Gendron Decl. ¶¶ 14-18; Booth Decl. ¶¶ 19-22. The plaintiff exercised its Options effective as of December 2014. The plaintiff received Richard L. Duchossois's signed Assignment in December and scans of the remaining signed Assignments in

---

[6] The email appears to be a follow up to a phone call. Booth Decl. Ex. 4 (ECF No. 7-5).
[7] There is actually no record of this wire transfer in Booth Decl. Ex. 3, which has all the payments to the Duchossoises in the record. But there is an earlier email from Czosek asking that all payments to the father be made via wire transfer.

January 2015. Booth Decl. ¶¶ 21-23. The plaintiff paid the balance on Richard L. Duchossois's interest by wire transfer on December 30, 2014, and on the remaining interests by check on February 3, 2015. Booth Decl. ¶ 10; Booth Decl. Ex. 3.

In June of 2015 and May and June of 2016, the defendants sent their Partnership distributions by check to the plaintiff in Maine.[8] Booth Decl. ¶¶ 26-27. The parties engaged in routine correspondence regarding these payments. Booth Decl. Ex. 11 (ECF No. 7-12).

The parties also collaborated on tax issues. Specifically, the plaintiff prepared and sent the defendants certain tax forms for tax years 2014 and 2015 to shift the defendants' Partnership tax liabilities to the plaintiff. Booth Decl. ¶¶ 31-32. The plaintiff says the defendants "solicited" it to prepare these forms, Pl.'s Opp'n at 10, a characterization that is arguably[9] supported by the record, at least as to the forms for tax year 2014. Booth Decl. ¶ 32; Booth Decl. Ex. 10 (ECF No. 7-11). (The Option Agreement and Assignment are silent on the parties' responsibilities for accomplishing the shift in tax burden.)

In October of 2016, the Partnership experienced a "capital event" that led to combined distributions of over $1,000,000 to the defendants. The defendants

---

[8] By that time, the plaintiff had been sued in Illinois state court by the Partnership, the General Partner, and several other partnerships controlled by the General Partner. That suit was initiated in March of 2015; the defendants also received notice that month from the General Partner that the Partnership did not recognize the defendants' assignments. Defs.' Mot. 8; Hager Decl. ¶¶ 34-35; Czosek Decl. ¶¶ 28-30. The defendants nevertheless forwarded Partnership distributions to the plaintiff in June of 2015 and May and June of 2016. Booth Decl. ¶¶ 26-27.

[9] This characterization of the correspondence the plaintiff has cited is a stretch, but I accept it for purposes of the motion.

have refused to turn over these distributions to the plaintiff despite its demands. Booth Decl. ¶¶ 33-34; Compl. ¶¶ 42-47.

This is the factual record I use for the prima facie jurisdictional analysis.[10]

## ANALYSIS

### 1. Subject Matter Jurisdiction

The defendants removed the case from Maine Superior Court on the basis of diversity jurisdiction. Notice of Removal ¶ 7 (citing 28 U.S.C. § 1332(a)(1)). The parties are diverse: the plaintiff is a citizen of Maine, while the defendants are citizens of other states. Id. ¶ 14.

I conclude that the amount-in-controversy requirement is also satisfied. The defendants aggregate the value of the plaintiff's claims against each of them in their Notice of Removal to reach an amount in controversy of $1,044,490. Id. ¶ 15(c). But claims by a single plaintiff against multiple defendants cannot be aggregated to satisfy the amount in controversy requirement unless those

---

[10] The plaintiff's brief requests jurisdictional discovery in the event that I have "concerns or doubts" about the sufficiency of the defendants' contacts with Maine. Pl.'s Opp'n 5 n.2. This is akin to disfavored "'wait and see' pleading," see Kader v. Sarepta Therapeutics, Inc., __ F.3d __, No. 17-1139, 2018 WL 1616954, at *9 (1st Cir. Apr. 4, 2018). In any event, I conclude that there is no need for jurisdictional discovery. "[A] plaintiff [has] the obligation to present facts to the court which show why jurisdiction would be found if discovery were permitted. . . . Failure to allege specific contacts, relevant to establishing personal jurisdiction, in a jurisdictional recovery request can be fatal to that request." United States v. Swiss Am. Bank, Ltd. 274 F.3d 610, 626-27 (1st Cir. 2001). The plaintiff's brief does not specify what contacts could or would be found in discovery. At oral argument, the plaintiff's counsel mentioned only the defendants' submission to the IRS of certain tax forms prepared for them by the plaintiff—contacts which are not related to this dispute—but no other specific contacts. The plaintiff has thus not offered a "more detailed description of the 'additional pertinent avenues of inquiry' that it hope[s] to pursue." Id. at 626. Further, the plaintiff presumably already possesses evidence of nearly all the defendants' contacts with Maine—phone calls and emails to it—and has had an opportunity to put that evidence in the record. Although the "threshold for limited jurisdictional discovery is 'relatively low,'" Plixer Int'l, Inc. v. Scrutinizer GmbH, No. 16-cv-578, 2017 WL 5905282, at *2 (De. Me. May 5, 2017) (citation omitted), I am satisfied the plaintiff has not met it here. Id. ("[T]he district court has broad discretion to determine whether limited discovery should be allowed." (citing Swiss Am. Bank, Ltd., 274 F.3d at 625-26)).

defendants are jointly liable. 14AA Wright & Miller, Fed. Prac. & Proc. Juris. § 3704 n.15 (4th ed.) (collecting cases). Nevertheless I am satisfied that the amount claimed against each defendant individually satisfies the jurisdictional threshold. Compl. ¶¶ 43-44.

### 2. *Personal Jurisdiction*

When subject matter jurisdiction is based upon diversity of citizenship, a federal court asserts personal jurisdiction in accordance with the law of the forum (here, Maine) and the Fourteenth Amendment's due process clause. Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995). The federal court becomes "the functional equivalent of a state court sitting in the forum state." Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016) (quoting Sawtelle, 70 F.3d at 1387). The Maine Law Court says that its statutory analysis tracks the due process clause. Murphy v. Keenan, 667 A.2d 591, 593 (Me. 1995) ("Maine's jurisdictional reach is coextensive with the due process clause of the United States Constitution."). This leaves only the federal constitutional inquiry.[11] The plaintiff asserts specific, not general, jurisdiction.

---

[11] That is, unless the Maine Law Court has a narrower interpretation of the Fourteenth Amendment than the First Circuit. In that case, Maine's jurisdictional reach is not in fact coextensive with the due process clause—a matter of federal law—but is controlled by the Law Court's interpretation and application of the Fourteenth Amendment—a state standard. In a diversity case like this one, that narrower interpretation would govern. See Maine Helicopters, Inc. v. Lance Aviation, Inc., 563 F. Supp. 2d 292, 294-95 (D. Me. 2008); 4 Wright & Miller, Fed. Prac. & Proc. Civ. § 1068 (4th ed.) ("A state's judicial interpretations of the reach of its jurisdictional statutes are binding on the federal courts."). I conclude that the Maine Law Court does not have a materially narrower interpretation than the First Circuit of how far due process extends. Its three-part test, although formulated differently, substantially overlaps the federal standard. See In re Emma B., 169 A.3d 945, 948 n.3 (Me. 2017) (test is (1) forum's state's legitimate interest in the subject matter of the litigation; (2) defendant's reasonable anticipation of litigation in the forum; (3) "traditional notions of fair play and substantial justice").

"The Due Process Clause of the Fourteenth Amendment requires that a defendant 'have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Baskin-Robbins, 825 F.3d at 35 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  The First Circuit has said that the legal elements of minimum contacts analysis in specific jurisdiction cases are, in the conventional jargon, relatedness, purposeful availment, and reasonableness.  Id. (citing C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014)).  The plaintiff "ordinarily must shoulder the burden of proving personal jurisdiction over the defendant." United States v. Swiss Am. Bank, Ltd. 191 F.3d 30, 40 (1st Cir. 1999).

"Jurisdictionally speaking, each defendant must stand or fall based on its own contacts with the forum." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 n.2 (1st Cir. 1999).  Because all the defendants' contacts with Maine were accomplished through their agents, however, I analyze them all at once save, briefly, on one of the "Gestalt" reasonableness factors.

Looming large over any analysis of personal jurisdiction in a contract case[12] like this one is the Supreme Court's seminal decision in Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985).  The Court there rejected the notion that a "contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts" in the plaintiff's home forum.  Id. at 478.

---

[12] The parties agreed at oral argument that the same analysis applies to the plaintiff's unjust enrichment claim.  The First Circuit has repeatedly used a contract-oriented jurisdictional analysis in cases with related breach of contract and unjust enrichment claims.  See, e.g., C.W. Downer, 771 F.3d at 64, 66; Bluetarp Fin., Inc. v. Matrix Const. Co., Inc., 709 F.3d 72, 77, 80 (1st Cir. 2013).

> Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

Id. at 479 (citations omitted). The First Circuit describes this as a "'contract-plus' analysis." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 621 (1st Cir. 2001) (quoting Ganis Corp. of California v. Jackson, 822 F.2d 194, 197-98 (1st Cir. 1987). It applies to both relatedness and purposeful availment. Adams v. Adams, 601 F.3d 1, 7 n.10 (1st Cir. 2010).

### a. Relatedness

"Relatedness requires that 'the action . . . directly arise out of the specific contacts between the defendant and the forum state.'" Baskin-Robbins, 825 F.3d at 35 (quoting Sawtelle, 70 F.3d at 1389)). It is a "flexible, relaxed standard." Id. (citing Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994)). In addition to Burger King's "contract-plus" factors, the First Circuit frequently notes that "[a] consideration in a contract action such as this is whether the defendant's forum-based activity was instrumental in the contract's formation or breach." Bluetarp Fin., Inc. v. Matrix Const. Co., Inc., 709 F.3d 72, 80 (1st Cir. 2013) (citing Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007)); accord C.W. Downer, 771 F.3d at 66; Adams, 601 F.3d at 6; Phillips Exeter, 196 F.3d at 289. Sometimes the court uses only the "instrumental in either the formation or breach" language and not the broader language of Burger King. See, e.g.,

Carreras v. PMG Collins, LLC, 660 F.3d 549, 554 (1st Cir. 2011); Phillips v. Prairie Eye Center, 530 F.3d 22, 27 (1st Cir. 2008).

Relatedness is meant to focus "the court's attention on the nexus between a plaintiff's claim and the defendant's contact with the forum." Baskin-Robbins, 825 F.3d at 35. There is some uncertainty in the cases, however, about how tight that nexus must be. Compare Carreras, 660 F.3d at 554-55 (only contacts going to formation or breach are related) and Swiss American, 274 F.3d at 622 (letter to the forum not a related contact because "not essential to either the formation or the breach of the alleged contract") with Bluetarp, 709 F.3d at 80-82 (finding relatedness based in part on a number of contemplated future consequences not strictly relevant to breach) and Ganis Corp., 822 F.2d at 197-98 (under Burger King, "the court is to look at all of the communications and transactions between the parties, before, during and after the consummation of the contract"). Relatedness is "the least developed prong of the due process inquiry." Sawtelle, 70 F.3d at 1389.

Here, it is true that the plaintiff initially reached out to the defendants in Illinois about entering these agreements, as the defendants note. Defs.' Mot. 11. But to form the contracts at issue, the defendants signed the Option Agreements and then sent them back into Maine.[13] Who *initiated* a contact may affect the

---

[13] The defendants claim that the contracts were formed in Illinois, where they were signed. Defs.' Reply 1 (ECF No. 8); Defs.' Mot. 11. The plaintiff says that the defendants "gave effect to" the Option Agreements by sending them to Maine. Pl.'s Opp'n 13. If the defendants are correct, then the contracts were not "'formalized and entered into' in the forum state," Prairie Eye Ctr., 530 F.3d at 27 (citation omitted), and mailing them to Maine was a merely ministerial act. If the plaintiff is correct, then mailing the contracts to Maine was necessary to their formation and thus legally significant. Neither the plaintiff nor the defendants cite any authority on contract formation to support their position. Under Maine law, "[t]he establishment of a contract requires

assessment of foreseeability and thus purposeful availment of a particular forum, Prairie Eye Ctr., 530 F.3d at 29 (1st Cir. 2008), but that does not mean that the defendants' sending the agreements to Maine is not a *related* contact. Later, the defendants sent the executed Assignments into Maine after soliciting the plaintiff in Maine to exercise its options (or, in Richard Bruce Duchossois's case, after his estate notified the plaintiff of his death). "The transmission of information into [the forum] by way of telephone or mail is unquestionably a contact for purposes of our analysis." Sawtelle, 70 F.3d at 1389-90 (citing Burger King, 471 U.S. at 476). These contacts are all related to the plaintiff's lawsuit.

The plaintiff asserts that the defendants breached the contracts by failing to make payments due to it in Maine and that this failure is a Maine contact. I agree. Citing some district court cases, the defendants argue vehemently that they have *no* Maine contacts related to breach, because the failure to make a payment due[14] in the forum is not a forum contact. Defs.' Mot. 12. The First

---

that the parties mutually assent 'to be bound by all its material terms; the assent must be manifest in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties.'" Forrest Assocs. v. Passamaquoddy Tribe, 760 A.2d 1041, 1044 (Me. 2000) (citation omitted). An acceptance requires "a communication in the same medium [as the offer] purporting to accept it in the exact terms of the offer." Zamore v. Whitten, 395 A.2d 435, 439 (Me. 1978), overruled on other grounds by Bahre v. Pearl, 595 A.2d 1027 (Me. 1991). Under the common law "mailbox rule," "unless the offer provides otherwise . . . an acceptance under an option contract is not operative until received by the offeror." Restatement (Second) of Contracts § 63(b) (1981). I assume arguendo that the contracts were formed either when they were received in Maine or sent to Maine. In either case, the Maine contact would be "instrumental" to formation.
[14] The defendants also assert that payments are not "due" in Maine because the contracts say only that *notices* and communications, but not payments specifically, are to be sent to the plaintiff in Maine. Defs.' Mot. 14; Option Agreement ¶ 9. The First Circuit has engaged in similar reasoning. Adams, 601 F.3d at 8 & n.13 But unlike the defendant in Adams, the defendants here *in fact* sent payments to the plaintiff in Maine. Booth Decl. ¶¶ 25-27. "Inferences can be drawn from ' . . . the parties' actual course of dealing.'" Bluetarp, 709 F.3d at 80. On this record, the clear inference is that payments to the plaintiff were due in Maine.

Circuit disagrees: the failure to make payments in the forum is not *enough by itself* to satisfy relatedness. <u>Phillips Exeter</u>, 196 F.3d at 291 (this failure "alone does not possess decretory significance"). But "a contract arguably is breached where a promisor fails to perform. Indeed, courts repeatedly have held that the location where payments are due under a contract is a meaningful datum for jurisdictional purposes." <u>Id</u>. (citing <u>Burger King</u>, 471 U.S. at 480).

The parties dispute the relevance of the defendants' Maine contacts in the course of performing the agreements. Those contacts are the defendants' Partnership distribution payments to the plaintiff and related communications, as well as the parties' collaboration on tax issues, especially the defendants' solicitation of the plaintiff to prepare certain tax forms. The defendants say that these contacts are not "instrumental" to either formation or breach, while the plaintiff says that they are part of <u>Burger King</u>'s "contract-plus" framework.

Keeping in mind that relatedness is a "flexible, relaxed standard," <u>Baskin-Robbins</u>, 825 F.3d at 35, and <u>Burger King</u>'s admonition that the "contract-plus" factors "*must* be evaluated," 471 U.S. at 479 (emphasis added), I conclude that the defendants' payments to the plaintiff in Maine (and associated communications) are related contacts but that the tax preparation contacts are not. Although collaboration on tax filings was predictable, it is nowhere required in the contracts themselves[15]—unlike the plaintiff's right to distributions, <u>see</u> Option Agreement ¶ 6. Further, the defendants' payments have a tighter nexus

---

[15] The Option Agreements include certain tax liability as part of the option price, Option Agreement ¶¶ 1(f), 2(a)(ii), and the Assignments call for allocation of tax credits as between the parties, Assignment ¶ 4, but neither calls for any particular performance in satisfying the IRS of the shift of the defendants' tax liability to the plaintiff.

with the plaintiff's claim—breach by failure to pay—than this unspecified aspect of their performance with which the plaintiff finds no fault.

In sum, the defendants' related contacts with Maine are: sending the signed Option Agreements into Maine; soliciting the plaintiff in Maine to exercise its options; sending the executed Assignments into Maine; sending three Partnership distributions each into Maine (one under the Option Agreements and two under the Assignments); corresponding with the plaintiff's agents in Maine about all of the above; and refusing to send further distributions into Maine (presumably there are communications from the defendants to this effect but they are not in the record).

I conclude that these contacts are sufficient to satisfy the relatedness requirement. See Adams, 601 F.3d at 6 (despite absence of "typical factors," relatedness satisfied, arguendo, by defendant's accepting funds from, agreeing to repay, and then failing to repay forum resident); Prairie Eye Ctr., 530 F.3d at 27-28 (despite absence of "typical factors," relatedness satisfied, arguendo, where plaintiff's claim arose "out of his contractual relationship with" the defendant and defendant sent communications to plaintiff in the forum). I am mindful that relatedness is not satisfied "merely because a plaintiff's cause of action arose out of the general relationship between the parties," Phillips Exeter, 196 F.3d at 290, and that the failure to make payments in the forum may not itself be sufficient, id. at 291. But here the Duchossoises have at least as many contacts with Maine as the defendant had with the forum in Adams.

In reaching this conclusion, I do not consider paragraph four of the Option Agreements, which required the defendants to vote their Partnership interests

as directed by LPS. Option Agreement ¶ 4. Being "subject to 'substantial control and ongoing connection to [the forum state] in the performance of the [the] contract'" can support a finding of relatedness. Adams, 601 F.3d at 6 (quoting Prairie Eye Ctr., 530 F.3d at 27). But there is no record evidence of the plaintiff exercising any control, let alone substantial control, over the defendants pursuant to this provision. Although the defendants could still have been *subject* to this control, it is not clear that control was "substantial." In any case, like the tax preparation contacts, the possibility of voting control has only an attenuated connection to the plaintiff's claims.

### b. *Purposeful Availment*

This standard "requires that the defendant's contacts 'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's presence before the state's courts foreseeable.'" Bluetarp, 709 F.3d at 82 (quoting Hannon v. Beard, 524 F.3d 275, 284 (1st Cir. 2008)). "The focus is on the defendant's intentions, and the cornerstones are voluntariness and foreseeability." Id. This focus "prohibits jurisdiction based on 'random, fortuitous, or attenuated contacts." C.W. Downer, 771 F.3d at 66 (quoting, at bottom, Burger King, 471 U.S. at 475).

### (i) *Voluntariness*

"Voluntariness requires that the defendant's contacts with the forum state 'proximately result from actions by the defendant *himself*." Prairie Eye Ctr., 530 F.3d at 28 (quoting Burger King, 471 U.S. at 475). "The defendant's contacts

'must be deliberate, and not based on the unilateral actions of another party."
Bluetarp, 709 F.3d at 82 (quoting Prairie Eye Ctr., 530 F.3d at 28).

Voluntariness is not an issue here. Knowing that the plaintiff was in Maine, the defendants entered into agreements with it, sent payments, and directed communications to it there. These contacts are "plainly voluntary." Prairie Eye Ctr., 530 F.3d at 28 (contacts "plainly voluntary" where defendant knew that plaintiff was a forum resident and mailed contractual documents to the plaintiff in the forum); accord Bluetarp, 709 F.3d at 82; cf. Adams, 601 F.3d at 6.

### (ii) Foreseeability

Foreseeability is the critical issue here. It "requires that the contacts . . . be of a nature that the defendant could 'reasonably anticipate being haled into court [in the forum].'" Prairie Eye Ctr., 530 F.3d at 28 (citation omitted). I conclude that the defendants' contacts with Maine, though not random or fortuitous, are too attenuated to make jurisdiction over them here reasonably foreseeable.

After being solicited from Maine, the defendants knowingly entered into contracts with a Maine entity, but that is not enough. "[T]he defendant's awareness of the location of the plaintiff is not, on its own, enough to create personal jurisdiction over the defendant." Prairie Eye Ctr., 530 F.3d at 28; accord Adams, 601 F.3d at 7. "Without evidence that the defendant actually reached out to the plaintiff's state of residence to *create* a relationship—say, by solicitation—the mere fact that the defendant willingly entered into a tendered relationship does not carry the day." Phillips Exeter, 196 F.3d at 292. Sending

the signed Agreements and Assignments to Maine, then, does not by itself show purposeful availment. Cf. Prairie Eye Ctr., 530 F.3d at 29 ("It stretches too far to say that [the defendant], by mailing a contract with full terms to [the forum] for signature and following up with three e-mails concerning the logistics of signing the contract, should have known that it was rendering itself liable to suit in [the forum]."); accord Carreras, 660 F.3d at 556.

The record contains more than the mere awareness of the plaintiff's location and accompanying contacts found inadequate in Phillips Exeter, Prairie Eye Center, and Adams, but not much more: a Maine choice-of-law clause in the Option Agreements, soliciting the plaintiff to exercise its options, and paying out three Partnership cash flow distributions each over three years, or one payment per year.[16]

Standing alone, choice-of-law provisions cannot confer jurisdiction, but they can help demonstrate purposeful availment. Burger King, 471 U.S. at 482. The Option Agreements here (¶ 10) have a Maine choice-of-law provision.[17] But the Assignments have a conflicting choice-of-law provision: they are governed by "the laws of the state where the Partnership is domiciled," which is Illinois. Assignment ¶ 5. The parties cite no cases on how conflicting choice-of-law provisions affect jurisdiction. I consider them a wash.

Soliciting the plaintiff to exercise its options was merely an extension of the parties' preexisting relationship that had been initiated by the plaintiff. By

---

[16] The alleged breach itself, while a Maine contact, does not tend to show that the defendants purposefully availed themselves of the benefits and protections of Maine.

[17] But they do not have a forum selection clause, which in conjunction with a choice-of-law provision can make jurisdiction "eminently foreseeable." Bluetarp, 709 F.3d at 82. This combination was "very significant[]" to the finding or jurisdiction in Bluetarp. Id.

soliciting the plaintiff to exercise the options, the defendants did not "reach[] out to the plaintiff's state of residence to *create* a relationship." Phillips Exeter, 196 F.3d at 292 (although presumably they did "benefit[] from [this] contact[]," id.).

More significant are the payments. The contracts arguably[18] envision an ongoing, long term arrangement between the parties, as reflected by the defendants' regularly forwarding Partnership distributions to the plaintiff. But those payments were made just once a year.[19] The First Circuit has distinguished such "occasional payments into the forum" from "a constant stream of payments." Baskin-Robbins, 825 F.3d at 38-39 (contrasting the annual payments in Phillips Exeter with the fourteen years of monthly payments in the case before it). The former "lack any 'decretory significance' in the jurisdictional calculus" while the latter are "jurisdictionally significant." Id.; see also Ganis Corp., 822 F.2d at 195, 198 (finding jurisdiction based on contract requiring five years of monthly loan repayments and other plus factors). But see Baskin-Robbins, 825 F.3d at 38. ("Viewed in isolation, [] payment flows . . . are suggestive, though perhaps inconclusive."). To the extent purposeful availment

---

[18] It is not clear whether the parties expected the plaintiff to receive distributions directly from the Partnership after the Assignments were executed. In fact the defendants continued forwarding them to the plaintiff, perhaps because they were aware that the Partnership did not recognize the Assignments. If the parties expected the plaintiff to be paid directly by the Partnership, that would undermine the notion of a long term, ongoing relationship between the parties. I assume that the parties expected the defendants to continue forwarding Partnership distributions to the plaintiff, as their course of performance reflects.

[19] Nothing in the contracts themselves requires the cash flow distributions to be annual. Nor am I aware of anything else in the record—besides the parties' course of performance—suggesting that the Partnership makes distributions to its limited partners annually (or after capital events). Only a small portion of the underlying Partnership agreement is in the record. Hager Decl. Ex. B (ECF No. 6-6). I view course of performance, then, as indicative of the regularity of distributions.

turns on the frequency of cash flow, the defendants' payments into Maine are not numerous enough to make jurisdiction foreseeable.

A defendant who "has created 'continuing obligations' between himself and residents of the forum" has "manifestly . . . availed himself of the privilege of conducting business there." Burger King, 471 U.S. at 476. But unlike Burger King, this is not a case where the defendants "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with [the plaintiff] in [the forum]." Id. at 480. The option here may have been for twenty years, but the contracts and their performance reflect only sporadic and relatively minimal obligations in Maine for the defendants. Absent are the substantial, ongoing, interdependent controls and commitments that are typical of franchise and services contract cases and often justify jurisdiction. See, e.g., Burger King, 471 U.S. at 479-82 (defendant "deliberately reached out" to negotiate with forum corporation to purchase a long term franchise, subjecting himself to significant control from the forum and setting in motion numerous in-forum activities on his behalf); Baskin-Robbins, 825 F.3d at 36-40 (ongoing franchise contract with continuous services in the forum on the defendant-franchisee's behalf plus visits to the forum by defendant's personnel); Cossart v. United Excel Corp., 804 F.3d 13, 21 (1st Cir. 2015) (defendant recruited plaintiff in the forum to perform significant services on its behalf in the forum and facilitated this by providing office equipment to the plaintiff in the forum); C.W. Downer, 771 F.3d at 66-69 (defendant visited the forum to initiate the relationship, "actively negotiated the contract," and "procured the performance of extensive services in the . . . forum" that "required interactive communications

between the [parties] for an extended period of time"); <u>Bluetarp</u>, 709 F.3d at 80-82 (formation of credit agreement contemplated significant future in-forum activity on behalf of out-of-state defendant; defendant in fact used plaintiff's services and received monthly billing statements from plaintiff); <u>Adelson</u>, 510 F.3d at 50 (defendant formalized employment contract in the forum and regularly sought approval of finances from the plaintiff's office in the forum).[20]

Analogically, the plaintiff's best case from the First Circuit on foreseeability is probably <u>Ganis Corp.</u> The court there approved jurisdiction in California over Massachusetts residents who obtained a loan from a California lender and then defaulted on it. 822 F.2d at 195-96. The Note called for five years of monthly installment payments to the lender at its offices in California and contained a California choice-of-law provision. <u>Id</u>. at 195. Jurisdiction rested on these two contacts, an unwitting misrepresentation that the defendants sent to the plaintiff in California, and the many documents that the defendants saw or signed bearing the plaintiff's California address. <u>Id</u>. at 198. The court concluded that the defendants could not "knowingly avail themselves of the benefits of interstate commerce, even if it is through the use of agents, without also subjecting themselves to the corresponding obligations of such a bi-coastal transaction." <u>Id</u>. at 197.

Like the defendants in <u>Ganis Corp.</u>, the Duchossoises have allegedly refused to make payments due in Maine under a contract with a Maine choice-

---

[20] Nor is this case like <u>Pritzker v. Yari</u>, 42 F.3d 53 (1st Cir. 1994), where purposeful availment rested on the defendant's "knowingly acquiring an economically beneficial interest in the outcome of a [forum-based] lawsuit that involved control over property in [the forum]." <u>Id</u>. at 62.

of-law provision, and have seen or signed numerous documents bearing LPS's Maine address. They also may have sent a misrepresentation into Maine, insofar as they warranted in the Assignments that they had "the power and authority to transfer the Partnership Interest" to LPS, Assignment ¶ 3(c), whereas the underlying Partnership agreements prohibited the transfer. Defs.' Mot. 8; Illinois Litigation Am. Compl. ¶ 5, Reichl Decl. Ex C (ECF No. 6-12). "The transmittal of such a misrepresentation, even if unwitting, has been held to represent substantial contacts for the purpose of finding personal jurisdiction." Ganis Corp., 822 F.2d at 198. But as noted *supra*, the Maine choice-of-law provision in the Option Agreements is neutralized by a conflicting provision in the Assignments, and the defendants here made only annual payments to the plaintiff, not monthly payments. Baskin-Robbins, 825 F.3d at 38-39. More significantly, the Ganis Corp. defendants reached out into interstate commerce to find a loan. 822 F.2d at 195 (defendants' agent solicited a Texas company who in turn solicited the plaintiff in California). The Duchossoises, by contrast, did not reach out into interstate commerce looking to sell their Partnership interests, but were solicited from Maine by LPS. Cf. Carreras, 660 F.3d at 555-56 ("A company does not subject itself to jurisdiction in a forum simply by following up with forum residents who, without prior solicitation, have expressed interest in purchasing the company's product."); Redondo Const. Corp. v. Banco Exterior de Espana, S.A., 11 F.3d 3, 5 (1st Cir. 1993) (jurisdiction over defendant who traveled to forum to solicit plaintiff's business). Their contacts with Maine are quantitatively and qualitatively more limited than the Ganis Corp. defendants.

For all these reasons, I conclude that the defendants did not purposefully avail themselves of the privilege of conducting activities in Maine in a way that would make jurisdiction over them here foreseeable.

### c. *Reasonableness*

Because the plaintiff has not demonstrated that the defendants have the requisite minimum contacts with Maine, the issue of reasonableness is not determinative, Sawtelle, 70 F.3d at 1394, but I analyze it anyway. See Scottsdale Capital Advisors Corp. v. The Deal, LLC, __ F.3d __, No. 17-1968, 2018 WL 1601792, at *4 (1st Cir. Apr. 3, 2018) (helpful for district court to analyze all three elements of specific jurisdiction even where circuit court analyzes only one element).

"Reasonableness" means "that, even where purposefully generated contacts exist, courts must consider a panoply of other factors which bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 209 (1st Cir. 1994) (citation omitted). Reasonableness is a question of "the fundamental fairness of an exercise of jurisdiction." Swiss American, 274 F.3d at 621 (citation omitted). The Supreme Court has identified five factors in assessing whether it is reasonable under the Fourteenth Amendment due process clause to require a defendant to appear in a particular forum. The First Circuit calls them the Gestalt factors. They are: (1) the defendant's burden in appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all

sovereigns in promoting substantive social policies. Ticketmaster, 26 F.3d at 209. The burden is on the defendants to demonstrate unreasonableness. Id. at 210. The weaker the plaintiff's showing on relatedness and purposeful availment, the less the defendant needs to show on this prong to defeat jurisdiction. Id.

### (i) The Defendants' Burden

Only a "special or unusual burden" carries any weight here. Adelson, 510 F.3d at 51 (legally blind diabetic living in Israel did not face special or unusual burden in appearing in Massachusetts); accord Baskin-Robbins, 825 F.3d at 40. Only Richard L. Duchossois, at 96 years old, potentially faces such a burden. At oral argument, counsel for the defendants conceded that the senior Duchossois is in good health. The defendants' burden in appearing is relatively minor. I therefore put little weight on this defendant-favoring factor.

### (ii) The Forum State's Interest

Maine has a "'manifest interest' in providing its resident with a convenient forum for redressing injuries by out-of-state actors." Baskin-Robbins, 825 F.3d at 40 (quoting Burger King, 471 U.S. at 473); accord C.W. Downer, 771 F.3d at 70 (calling this a "particularly weighty factor"); Harriman v. Demoulas Supermarkets, Inc., 518 A.2d 1035, 1036 (Me. 1985) ("Maine has an interest in providing . . . Maine citizens [with] a means of redress against nonresidents.").

The defendants point out that this interest *always* exists where the plaintiff has sued an out-of-state defendant in its home forum and argues that it should not count for much, Defs.' Mot. 16—not unlike how the first Gestalt factor counts for a defendant only if the defendant's burden is out of the ordinary.

The argument is foreclosed by First Circuit precedent.  *E.g.*, <u>Baskin-Robbins</u>, 825 F.3d at 40.  This factor somewhat supports a Maine forum.

### (iii)  The Plaintiff's Interest in Obtaining Convenient and Effective Relief

"Courts regularly cede some deference to the plaintiff's choice of forum." <u>Baskin-Robbins</u>, 825 F.3d at 41.  The defendants nevertheless argue that the plaintiff "easily may bring its claims" in Illinois.  Defs.' Mot. 16.  "Putting this spin on the matter—emphasizing that the plaintiff could just as easily litigate in a [non-forum] court—effectively nullifies the plaintiff's choice to litigate its suit [in the forum]."  <u>Foster-Miller, Inc. v. Babcock & Wilcox Canada</u>, 46 F.3d 138, 151 (1st Cir. 1995).  This factor supports a Maine forum.

### (iv)  The Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy

This lawsuit's center of gravity is in Illinois: it concerns in part the alienability of Illinois limited partnership interests in Illinois real estate governed by Illinois law, issues which have been raised in a pending Illinois lawsuit. Maine's only interest in the suit is that LPS is a Maine resident.

That said, the documentary evidence should be readily available in both fora, and while Illinois appears to have more potential witnesses,[21] the distribution is not overwhelmingly in Illinois's favor, and depositions are generally held in the deponent's home jurisdiction.  The litigation can be efficiently conducted in either forum, with a slight edge to Illinois.

---

[21] Four of the five defendants are in Illinois (Thomas A. Smith has a Florida address, Booth Decl. Ex. 4).  Each side offered two agents' declarations, probably the primary fact witnesses.

The defendants argue that an Illinois court would be better equipped to apply Illinois law. Defs.' Mot. 16. This is probably true. See N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 26 (1st Cir. 2005) (efficient administration of justice is served where court is familiar with the law that governs the dispute); but see Baskin-Robbins, 825 F.3d at 41 ("A federal court sitting in [Maine] is fully capable of applying [Illinois] law.").

They also argue that proceeding with the case here risks "duplicative" or "piecemeal" litigation given the pending Illinois litigation. Defs.' Mot. 16. This might be true if the defendants were parties to that litigation. See Bluetarp, 709 F.3d at 83 (there was "at least a question" of efficiency where an earlier suit was filed in another forum, though it did not "tip the constitutional balance"). But they are not. In fact, the plaintiff's counsel represented at oral argument that the plaintiff has sought their participation in the Illinois litigation, a request which was opposed by the General Partner and denied by the judge. At most, the Illinois litigation (depending on the outcome) could furnish some issue preclusion arguments against LPS by the Duchossoises.

Conversely, the plaintiff argues that because this is the *only* suit between these parties, efficiency favors proceeding here. Pl.'s Opp'n 18. That is true to an extent, but this suit is still in its infancy and could easily be refiled in Illinois if dismissed now.

Usually this factor is a wash. Baskin-Robbins, 825 F.3d at 40; Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 718 (1st Cir. 1996). Here, it supports an Illinois forum.

### (v) The Common Interests of All Sovereigns in Promoting Substantive Social Policies

Maine "has a legitimate stake in providing its citizens with a convenient forum for adjudicating disputes." Baskin-Robbins, 825 F.3d at 41. This interest has arguably been accounted for by the second factor, but it routinely makes an appearance under this factor as well.

Illinois, as noted above, has a strong interest in this case. That said, the defendants have not articulated any specific Illinois "substantive social policies" that are at stake. The First Circuit has been skeptical of resolving this factor on the basis of which forum's law will govern, especially when weighed against an interest like Maine's in providing a convenient forum for its citizens. Id. ("[The defendant contends that a] Washington statute will determine [the outcome of the case]. That is true as far as it goes, but it does not take [the defendant] very far. A federal court sitting in [the forum] is fully capable of applying Washington law. Equally as important, Washington's interest in the matter does not trump [the forum state's] interest." (citing Burger King, 471 U.S. at 483)).

Illinois's interest in this case is stronger than Washington's was in Baskin-Robbins, however: not only an Illinois statute is at issue, but also Illinois property interests in Illinois real estate. This factor modestly favors Illinois.

\* \* \* \* \*

I conclude that if I am incorrect and the defendants have in fact purposefully availed themselves of the privilege of conducting activities in Maine, the plaintiff has made at best a weak showing of relatedness and purposeful availment, and therefore the defendants need to show less on the Gestalt factors

to defeat jurisdiction. <u>Ticketmaster</u>, 26 F.3d at 210. But "[t]aken in their entirety, the Gestalt factors are in rough equipoise," <u>Baskin-Robbins</u>, 825 F.3d at 41, and do not "tip the constitutional balance," <u>Nowak</u>, 94 F.3d at 717. If purposeful availment were satisfied, it would not be unreasonable to exercise jurisdiction over the defendants here.

**CONCLUSION**

I **GRANT** the defendants' motion and **DISMISS** the complaint. Their request for a stay is **MOOT**.

**SO ORDERED.**

**DATED THIS 11ᵀᴴ DAY OF APRIL, 2018**

/s/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**